1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS
2

3   UNITED STATES OF AMERICA,

4     Plaintiff,

5  v.                 Docket No. 16-20060-01-JAR

6  LOGAN VIQUESNEY,      Kansas City, Kansas
                    Date:  05/31/2017
7     Defendant.
  ....................
8

9                 TRANSCRIPT OF
           CHANGE OF PLEA HEARING
10     BEFORE THE HONORABLE JULIE A. ROBINSON
        UNITED STATES DISTRICT JUDGE
11

12 APPEARANCES:

13 For the Plaintiff:   Ms. Kim I. Flannigan
                  United States Attorney's Office
14                360 U.S. Courthouse
               500 State Avenue
15                Kansas City, Kansas 66101

16 For the Defendant:   Mr. Tim Burdick
                  Federal Public Defender's Office
17                201 U.S. Courthouse
               500 State Avenue
18                Kansas City, Kansas 66101

19

20

21

22

23 _____

24     Kelli Stewart, CSR-KS, CCR-MO, RPR, CRR, RMR
             Official Court Reporter
     259 U.S. Courthouse, 500 State Avenue
25           Kansas City, Kansas 66101

```
 1                    (10:21 a.m., proceedings commenced).

 2              THE COURT:  All right.  We're here in United

 3   States versus Logan Viquesney.  The case number is

 4   16-20060.  Your appearances, please.

 5              MS. FLANNIGAN:  Your Honor, the United

 6   States appears by Kim Flannigan.

 7              MR. BURDICK:  Tim Burdick on behalf of Mr.

 8   Viquesney.  Logan Viquesney appears in person.

 9              THE COURT:  How do you say it?  Viquesney?

10              MR. BURDICK:  Viquesney.

11              THE COURT:  Viquesney, okay.  All right.

12   Mr. Viquesney, if you'll stand and raise your right

13   hand.

14                    (Defendant sworn).

15              THE COURT:  All right.  You can be seated.

16   All right.  Tell me your full legal name, please.

17              THE DEFENDANT:  Logan Mitchell Viquesney.

18              THE COURT:  And how old are you?

19              THE DEFENDANT:  I am 21 years old.

20              THE COURT:  And how many years of education

21   have you had?

22              THE DEFENDANT:  I have completed the 12th

23   grade and some college.

24              THE COURT:  All right.  Mr. Viquesney, have

25   you ever been diagnosed with or treated for a mental
```

1    illness?

2              THE DEFENDANT:  The only thing that I can

3    think of is ADHD.

4              THE COURT:  All right.  Was that when you

5    were in elementary school you were diagnosed with that?

6              THE DEFENDANT:  I'm not sure when.

7              THE COURT:  Okay.  Have you ever been

8    treated for or diagnosed with drug or alcohol abuse or

9    addiction?

10             THE DEFENDANT:  No.

11             THE COURT:  And today, are you under the

12   influence of any drug, medication, or alcoholic

13   beverage?

14             THE DEFENDANT:  No.

15             THE COURT:  All right.  You don't take

16   anything for the ADHD either, you don't take any

17   prescription medications?  All right.

18             THE DEFENDANT:  No.

19             THE COURT:  Have you been provided with a

20   copy of the indictment against you in this case?

21             THE DEFENDANT:  Yes.

22             THE COURT:  And have you gone over this

23   charge with your lawyer?

24             THE DEFENDANT:  Yes, I have.

25             THE COURT:  Do you understand what you're

1  charged with?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Have you and your lawyer, Mr.

4  Burdick, also discussed the evidence that the government

5  has against you in this case?

6          THE DEFENDANT:  Yes.

7          THE COURT:  All right.  And have the two of

8  you reviewed the plea agreement between you and the

9  government?

10          THE DEFENDANT:  Yes.

11          THE COURT:  There's another document that

12  will be filed today called a petition to enter plea.

13  Have you and Mr. Burdick also reviewed that document?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And do you understand the terms

16  of your plea agreement with the government?

17          THE DEFENDANT:  Yes, I do.

18          THE COURT:  Do you also understand what the

19  petition to enter plea says?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right.  And did Mr. Burdick

22  also discuss with you the sentencing process, how the

23  sentencing process ordinarily works with the judge

24  considering advisory sentencing guidelines as well as a

25  sentencing statute to determine the appropriate

1    sentence?

2              THE DEFENDANT:  Yes.

3              THE COURT:  All right.  Are you-- and I will

4    go over both the plea agreement with you, I'll go over

5    your right to a jury trial, I'll go over the sentencing

6    process with you in a little bit more detail.

7              Are you satisfied with the advice and

8    representation that you've received from your lawyer in

9    this case?

10             THE DEFENDANT:  Yes, I have [sic].

11             THE COURT:  All right.  All right.  I have a

12   copy of your plea agreement with the government.  It is

13   eight pages long, including the signature lines.  Does

14   this written plea agreement cover all of the promises

15   and all of the agreements that have been reached between

16   you and the government?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And who made the decision for

19   you to enter into this plea agreement?  Who made the

20   decision?

21             THE DEFENDANT:  Myself.

22             THE COURT:  Did anyone pressure, threaten,

23   or coerce you to make the decision to enter into this

24   plea agreement?

25             THE DEFENDANT:  No.

1          THE COURT:  Would it be fair to say that

2     it's a decision that you've made voluntarily and of your

3     own free will?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  I will ask Ms.

6     Flannigan to summarize the key terms of the plea

7     agreement.

8          MS. FLANNIGAN:  Your Honor, the defendant

9     has agreed to plead guilty to Count 1 of the indictment,

10    which is the sole count filed against him on June 29th,

11    2016, which charges him with a violation of Title 18

12    United States Code 2423(a) and 2426, which is

13    transportation of a minor with intent to engage in

14    criminal sexual activity.

15          The defendant understands that the maximum

16    sentence which may be imposed as to Count 1 of the

17    indictment is not less than ten years and not more than

18    life, a $250,000 fine, and a period of supervised

19    release of not less than five years or more than life.

20          The parties are proposing as an appropriate

21    disposition of the case a sentence of 180 months in

22    prison, followed by a term of 20 years of supervised

23    release, an amount of restitution to be determined by

24    the Court at the time of sentencing and, of course, the

25    imposition of a special assessment of $100 to be paid

1   during the time of the defendant's incarceration.

2           The parties are seeking this binding plea

3   agreement as an appropriate disposition because

4   obviously it brings certainty to the sentencing process

5   and both the defendant and the government would benefit

6   from the bargain they have struck.  If the Court permits

7   itself to be bound by the proposed sentence, then the

8   interest of justice would be served by the sentence,

9   thereby assuring the sentence is consistent with the

10  sentencing factors of 3553(a).

11          If the Court does not agree with the

12  sentence, the parties then would be restored to the

13  position they maintained prior to reaching the plea

14  agreement.

15          The parties do not believe that the proposed

16  sentence offends the advisory sentencing guidelines.

17          In return, the government has agreed not to

18  charge the defendant with any additional charges

19  relating to the facts and circumstances arising from

20  this current indictment.  The Court is under no

21  obligation to accept this plea agreement.

22          On the other hand, if the Court agrees to be

23  bound by the proposed plea agreement and accepts the

24  defendant's plea of guilty, he will not be permitted to

25  withdraw it.  Only if the Court should reject the

1    proposed plea agreement will the defendant be permitted

2    to withdraw his guilty plea.

3            The defendant has agreed to-- if the Court

4    agrees to the proposed plea agreement, the defendant has

5    agreed to waive any right to appeal or to collaterally

6    attack any matter in connection with this prosecution,

7    conviction, or sentence.  Obviously that is limited by

8    certain statutes and certain case law.  And the parties

9    understand that the defendant would not be waiving any

10   subsequent claim to ineffective assistance of counsel or

11   prosecutorial misconduct.

12           The defendant and the United States

13   Attorney's Office are the only parties to this agreement

14   and there are no other agreements that have not been

15   memorialized in this agreement.  That is the essence of

16   our plea agreement, Your Honor.

17           THE COURT:  All right.  Mr. Viquesney, was

18   there anything that Ms. Flannigan said about your plea

19   agreement that you disagree with or that you do not

20   understand?

21           THE DEFENDANT:  No, I do not.

22           THE COURT:  In Paragraph No. 9 of your plea

23   agreement you are agreeing to give up most of your

24   rights of appeal.  Paragraph 9 describes the limited

25   rights of appeal that you'll still have.  But do you

1    understand that you're otherwise giving up all other

2    rights of appeal?

3              THE DEFENDANT:  Yes.

4              THE COURT:  All right.  This is what we

5    refer to as a binding plea agreement.  If I accept the

6    terms of the plea agreement, then that means I'm

7    agreeing to be bound by the sentence that you and the

8    government have negotiated.  If I do not accept the plea

9    agreement, then you will have the ability to withdraw

10   your plea and then either proceed to trial or to

11   negotiate a new plea agreement.  Do you understand that?

12             THE DEFENDANT:  Yes.

13             THE COURT:  All right.  Now, one of the

14   consequences of your pleading guilty, Mr. Viquesney, is

15   that you're giving up your right to a jury trial.  Once

16   you plead guilty, there will not be a jury trial on any

17   of the issues in this case.  Do you understand?

18             THE DEFENDANT:  Yes.

19             THE COURT:  All right.  If you did not plead

20   guilty, you have a right to a jury trial.  And what that

21   means is that the case would be scheduled for trial, it

22   would be tried to a jury of 12 people.  You would

23   continue to be represented by your lawyer throughout the

24   trial.  Whether or not you had money for attorney's fees

25   or trial expenses, all of that would be covered for you

1   if you could not pay it yourself.

2          The case would be, again, tried to a jury of

3   12.  You could not be convicted of this charge unless

4   the jury was able to reach a unanimous verdict of

5   guilty.  And in order for the jury to find you guilty,

6   those jurors would have to decide that at trial the

7   government had proven your guilt with evidence beyond a

8   reasonable doubt, because that's the legal burden of

9   proof in any criminal case, beyond a reasonable doubt.

10          As the accused person at trial, you would

11   have the right to present a defense if you wanted to.

12   You could call witnesses, you could testify in your own

13   behalf, you could produce and present other kinds of

14   evidence.  But importantly, because the accused person

15   is presumed to be innocent of the charges, you would

16   have absolutely no responsibility to present evidence.

17          In other words, under the law you're

18   presumed to be innocent.  You don't have to do anything

19   to prove your innocence.  And those are very important

20   rules of law and rights that the jury would be

21   instructed about by me.

22          They would be instructed that you have no

23   obligation to prove anything, all of that responsibility

24   is on the government, and that they shouldn't expect you

25   to do anything because you're presumed to be innocent

1   and that alone is enough reason to find you not guilty.

2   They would be instructed that if you don't present a

3   defense, they would be instructed to not hold that

4   against you because if they did that, that would violate

5   the presumption that you are innocent.

6           Also at trial you would have the right to

7   confront and cross examine the government's witnesses

8   and perhaps in that way to point out doubt in the

9   evidence.

10          So that's the right to a jury trial and all

11  of the rights that that entails.  But again, once you

12  plead guilty to this charge, you're giving up your right

13  to a jury trial.  Understood?

14              THE DEFENDANT:  Yes.

15              THE COURT:  All right.  Now, there are

16  certain civil rights consequences of your pleading

17  guilty to the charge in the indictment because it is

18  classified as a felony crime.  And a felony crime is

19  simply any crime for which there is a maximum penalty of

20  more than one year.  Obviously this-- this crime has

21  more than a maximum of one year.

22          So the civil rights that you'll lose are:

23  You lose the right to vote, you lose the right to serve

24  on a jury, you lose the right to serve in certain public

25  offices.  You lose the right to purchase or possess a

1   firearm or ammunition.  And if you're not an American

2   citizen, there are deportation consequences also.  Do

3   you understand that?

4            THE DEFENDANT:  Yes, I do.

5            THE COURT:  All right.  And then there are

6   potential sentencing consequences.  And I'm going to

7   review with you the sentencing process and ordinarily

8   how that proceeds.

9            Now, if I accept the plea agreement, it

10  means that I will sentence you to the sentence that you

11  and the government have negotiated.  It brings certainty

12  to the sentencing process.  But it's still important

13  that you understand how the sentencing process

14  ordinarily works outside of a binding plea agreement

15  because if I don't accept the binding plea agreement,

16  then-- and you're ultimately convicted, then this is

17  the-- I guess I'd call it the ordinary sentencing

18  process when there isn't a binding plea agreement.

19            So the way that works is the sentence, of

20  course, is solely up to the judge.  And I start with

21  looking at-- or actually calculating and applying the

22  sentencing guidelines.  They're not mandatory guidelines

23  but the judge is required to use those guidelines as

24  part of the decision-making process.  And there are

25  dozens and dozens of these guidelines.

1          The sentencing guidelines and the sentencing

2   process itself is very complicated, and so it's

3   important to understand that at this stage of the

4   proceeding where you enter a plea of guilty, it's

5   impossible for me to predict with certainty what

6   sentence you'll receive, again, if there's not a binding

7   plea agreement that I accept.

8          For the same reason, because the sentencing

9   process is complicated it is impossible for Mr. Burdick

10  or Ms. Flannigan to predict with certainty what sentence

11  you'll receive.  They're both very experienced in

12  sentencing.  But again, until we go through the whole

13  process, which may require me deciding legal issues and

14  factual issues, me applying dozens of guidelines and

15  also considering a number of other factors, until we go

16  through all of that process, no one could predict with

17  certainty what sentence you'll receive.  Do you

18  understand that?

19          THE DEFENDANT:  Yes, I do.

20          THE COURT:  All right.  As far as the

21  guidelines, there are dozens of them.  The three that

22  typically have the most significant effect on the

23  recommended sentence under the guidelines are these:

24  No. 1, the guideline for the crime itself.  And for this

25  particular type of offense, there are a number of

1   factors under that guideline that may affect-- or drive

2   the sentence to be longer, such as the age of the victim

3   is something that-- the younger the age, the longer the

4   proposed-- or the recommended sentence under the

5   guidelines.  So there's the guideline for the crime

6   itself.

7           There's a guideline called the criminal

8   history guideline.  If you have prior convictions,

9   misdemeanors or felonies, those are all calculated.  And

10  the longer-- or the more criminal history someone has,

11  the longer the recommended sentence under the

12  guidelines.

13          There's also a guideline called the relevant

14  conduct guideline.  That guideline tells the judge to

15  consider other related criminal conduct, even though it

16  may not be charged in the indictment.  If it's relevant

17  and related, the judge factors that in and sometimes the

18  relevant conduct really lengthens the sentence.  The

19  idea is that the sentence should reflect everything

20  someone did, not just perhaps the piece of it that

21  they're pleading guilty to.

22          There are guidelines that are aggravating,

23  there are guidelines that are mitigating.  An example of

24  a mitigating guideline is the acceptance of

25  responsibility guideline.  If I believe that through

1   your plea of guilty and other conduct you've accepted

2   responsibility for what you did, then the guidelines

3   tell me to give you credit for that and to lower your

4   sentence somewhat.

5           Then there are a number of other sentencing

6   factors, many of which are particular to the person, not

7   to the person's conduct.  So I will consider everything

8   about your background and your present circumstances,

9   such things as your family situation, your employment,

10  your education, if you have any mental health issues,

11  emotional health issues, if you have physical health

12  issues, if you have drug or alcohol abuse or addiction,

13  all of that is taken into consideration as well.

14          So again, it's a very complicated process.

15  Again, if I accept the plea agreement, it brings

16  certainty to the process.  If I don't accept the plea

17  agreement, you can withdraw your plea and we'll proceed

18  from there.  And this will be the sentencing process

19  that will be used.  Do you understand that as well?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right.  What I can tell you

22  is that the statute that you're charged under, it does

23  set maximum penalties.  It also sets a mandatory minimum

24  penalty for custody and for supervised release.  So

25  here's what I can tell you with certainty even outside

1    of a binding plea agreement:  You would be facing a

2    maximum fine of $250,000, a $100 special assessment for

3    the Crime Victims Fund.  You'd be facing restitution in

4    whatever amount I would order it.

5              You would be facing a mandatory minimum of

6    five years of supervised release after prison and a

7    maximum of life on supervised release after prison.  And

8    then as far as prison time, you face a mandatory minimum

9    of ten years of prison and a maximum of life in prison.

10   Do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  All right.  And this is a-- what

13   we call a mandatory minimum crime.  It's under a

14   mandatory minimum statute.  And the way those statutes

15   work are that I have to impose at least the mandatory

16   minimum.  I have no legal authority to sentence you to

17   below the mandatory minimum of ten years in this case.

18             There are certain exceptions to the

19   mandatory minimum statutes, but there are no exceptions

20   that apply to this particular offense.  And so no matter

21   whether there's a binding plea agreement or not, if you

22   were convicted of this charge by plea or a jury, I would

23   have to sentence you to at least 120 months in prison

24   and I could sentence you to as much as life in prison.

25   Do you understand that?

1        THE DEFENDANT:  Yes.

2        THE COURT:  All right.  Also, whatever

3   sentence you receive, Mr. Viquesney, is essentially the

4   amount of time you should expect to serve in custody.

5   We don't have parole boards or parole commissions in the

6   federal system.  So this is not a system where the judge

7   gives you a sentence, you go-- you go to prison and then

8   later you go in front of another group of people and

9   perhaps convince them to reduce your sentence.  We don't

10  have that-- that system in the federal system anymore.

11  We haven't for about 30 years or more.

12        So in this case, if you were to receive a

13  180-month sentence, that would mean you'd serve about

14  180 months.  The only reason I say "about" is the Bureau

15  of Prisons does have this good-time credit program.  The

16  judge, the Court is not involved in that.  But if you

17  qualified for good-time credit, you could receive up to

18  15 percent off of your sentence.  But again, there's no

19  guarantee that you would get that, but-- so that's why I

20  say you should expect to serve about 180 months or

21  whatever the sentence would be that I would impose.  Do

22  you understand that?

23        THE DEFENDANT:  Yes.

24        THE COURT:  All right.  Ms. Flannigan, will

25  you tell us the factual basis for Mr. Viquesney's plea

1    to Count 1 of the indictment?

2              MS. FLANNIGAN:  Yes, Your Honor.  If this

3    case were to proceed to trial, the government's evidence

4    would be that on May 30th of 2016, S.L., who was a

5    16-year-old juvenile, went missing from her

6    grandparents' home in Dumfries, Virginia.  Relatives

7    noted that she was missing when she didn't return home

8    in the evening.  They contacted the local law

9    enforcement and S.L.'s immediate family, who was located

10   in the Kansas City, Missouri metropolitan area.

11             S.L.'s family attempted to locate her by

12   phone but her phone had been shut off.  They then used

13   social media in an effort to locate her and found

14   messages on Facebook of S.L. indicating that she was

15   lonely in Virginia.  There was a message responding from

16   an individual by the name of Logan Viquesney indicating

17   that he was also in Dumfries, Virginia.

18             S.L.'s family looked further at S.L.'s

19   Facebook page and located a phone number associated with

20   the defendant Logan Viquesney's Facebook account.  A

21   records check of the phone number provided that it was

22   subscribed to the defendant.  The girl's family then

23   contacted local law enforcement in Lenexa, Kansas on

24   June 1st of 2016.

25             On June 1st, 2016, law enforcement officers

1  with the Lenexa, Kansas Police Department went to the

2  last known address of the defendant and spoke with a

3  roommate who informed them that the defendant had been

4  kicked out of the apartment for not paying half of his

5  bills.

6        The detectives then went to his last known

7  place of employment where they made contact with the

8  defendant's mother.  The defendant's mother was

9  cooperative and informed the investigators that she was

10 aware the defendant was in Dumfries, Virginia on

11 May 29th of 2016 and in Illinois on May 31st.  The

12 defendant had told his mother he was going to Virginia

13 to purchase a vehicle.  The mother attempted to contact

14 her son but the telephone number was no longer in

15 service.

16        One of the defendant's former roommates

17 re-contacted the Lenexa Police Department and indicated

18 that the defendant had just texted him from an unknown

19 number.  Law enforcement officers were then able to

20 determine the location of that phone, and the phone was

21 traveling westbound on Interstate 70 near Oak Grove,

22 Missouri.

23        The defendant's roommate further cooperated

24 with law enforcement, telling the investigators that the

25 defendant was freaking out because he had taken a girl

1   from Virginia.  The defendant's ex-roommate was able to

2   get the defendant to stay at a location, pretending that

3   he was going to meet the defendant.  And Lenexa

4   detectives contacted task force officers with the FBI

5   for assistance and together they were able to locate the

6   defendant and S.L. in Kansas City, Kansas.

7            Law enforcement officers approached the

8   defendant while the defendant and S.L. were parked in a

9   parking lot in Kansas City, Kansas.  The defendant was

10  placed into custody without incident.  When S.L. exited

11  the vehicle, she stated, thank you for-- "thanks for

12  saving me."  Both the defendant and S.L. were

13  transported to the FBI headquarters and were

14  interviewed.

15            During the interview of S.L., she indicated

16  that she had been residing with family in Dumfries,

17  Virginia for part of the summer.  She was depressed and

18  lonely and made contact with a former friend of hers,

19  Logan, on Facebook.  She indicated she had met Logan a

20  couple of years ago when he was brought-- I think the

21  plea agreement said he was brought, "he brought another

22  friend," it should be "brought by another friend" over

23  to her residence in Grain Valley, Missouri.

24            He came to her residence on several

25  occasions with this mutual friend and even took her to

1    the friend's residence on one occasion.  She stopped

2    talking to the defendant because he continually came on

3    to her and she didn't want that.

4           During their recent communications on

5    Facebook, S.L. told Logan that she was lonely and wanted

6    to leave Virginia.  The defendant told S.L. that he was

7    on his way to Virginia to pick her up, and she didn't

8    know whether this was true or whether to believe him, so

9    she kept asking him and he proved he was on the way by

10   sending photos of his route, maps, et cetera.

11          The defendant picked her up at the address

12   she provided, which was her cousin's residence in

13   Dumfries, Virginia.  When she entered the vehicle, he

14   told her to log out of all of her accounts and turn off

15   her electronic devices.

16          The defendant and S.L. traveled to

17   Baltimore, Maryland, sat on the beach for a while.  From

18   there they traveled toward the Midwest, stopping a few

19   times to sleep at rest stops along the way.  They stayed

20   in a motel between Illinois and St. Louis, Missouri

21   called the Relax Inn on Tuesday, May 31st, 2016.

22          While at the motel, S.L. and the defendant

23   engaged in vaginal intercourse.  He did not wear a

24   condom and he ejaculated inside of her.  She did not

25   shower or change her clothes.

1          On June 1st, S.L. stated that they stopped

2     at an AT&T store.  She stayed in the vehicle while the

3     defendant took her iPhone into the store and had a new

4     number assigned to her device and put it on his phone

5     account.

6          While traveling, the defendant was concerned

7     about being caught, so he reached out to his friend Jay,

8     and the defendant arranged to meet Jay in Kansas City,

9     Kansas.  While they were waiting at the location, law

10    enforcement showed up and took them into custody.

11         Following the interview, agents took S.L. to

12    the Shawnee Mission Medical Center for a forensic

13    examination.  Several samples were taken as evidence.

14    They were submitted to the FBI lab for testing.  The lab

15    results identified the presence of the defendant's semen

16    on S.L.'s vaginal opening, labia, chest, and abdomen.

17         On June the 2nd, an FBI agent contacted S.L.

18    by phone for a follow-up and S.L. indicated that she had

19    never-- that she had been honest with the defendant

20    about her age when she met him a couple of years ago and

21    she had never lied to him about her age.

22         While traveling from Virginia prior to the

23    sexual intercourse, they discussed her age in the car

24    and he told her he could get in trouble for transporting

25    a 16-year-old without permission.

1          At the same time agents were interviewing

2    S.L., other agents were interviewing the defendant.

3    After having been provided his *Miranda* warnings, the

4    defendant signed a waiver and provided a statement.  The

5    defendant said that he had met S.L. in 2014 through a

6    mutual friend.  The two had maintained contact through

7    social media accounts, telephone calls, and text

8    messages.

9          During the initial time in 2014, the

10   defendant and S.L. met in person only one time and that

11   meeting took place at S.L.'s residence in Grain Valley.

12   S.L.'s older sister had blocked and deleted the

13   defendant on social media network and precluded-- which

14   precluded further contact.  The defendant also believed

15   S.L.'s cell phone account had been blocked so his calls

16   and messages couldn't reach her.

17         Approximately one week before, the defendant

18   received a social media network friend request from S.L.

19   After accepting the request, the defendant received a

20   message from S.L. informing him that she was in

21   Virginia.  The defendant asked if he could visit and she

22   agreed, providing him the address.

23         On May 29th the defendant left Kansas City,

24   Kansas driving a black Ford Fiesta rental vehicle.  He

25   made contact with S.L. after driving-- arriving at the

1    address she provided.  S.L. gathered items of clothing

2    and entered the Ford Fiesta.

3           The defendant drove S.L. away from the

4    residence, traveling through multiple states as the two

5    moved west.  The defendant received telephone calls from

6    the police officer who asked if he was with or had

7    knowledge-- or had information about S.L.  The defendant

8    lied to the police officer and denied having any

9    knowledge or contact with S.L.

10          Further, the defendant received a telephone

11   communication from S.L.'s father, who also inquired

12   about S.L.'s location.  The defendant lied to S.L.'s

13   father, advising that he had not had contact with her.

14          The defendant claimed he initially believed

15   S.L. to be 17 years of age until S.L. disclosed her true

16   age of 16 during their travels.  The defendant and S.L.

17   arrived in the area of East St. Louis, conducted an

18   Internet search for inexpensive hotels, and a located a

19   hotel in East St. Louis wherein he paid $35 cash for one

20   night's stay for two individuals.  S.L. remained in the

21   car while he registered at the hotel.

22          The defendant and S.L. engaged in vaginal

23   sex while at the hotel.  He noted that S.L. was on her

24   period and that the sexual intercourse was unprotected.

25          A criminal history check was conducted on

1    the defendant and revealed that was a registered sex

2    offender from a conviction in 2014 for aggravated

3    indecent solicitation of a minor.  The victim in that

4    case was 12 years old.

5          Agent Jones also reviewed the statutes for

6    both Illinois and Missouri regarding the age of consent

7    and both-- both of those locations require the age of

8    consent to be 17 years of age.  That would be the

9    government's evidence, Your Honor.

10          THE COURT:  All right.  Mr. Viquesney, two

11   questions about what Ms. Flannigan just read, which is

12   Paragraph No. 2 in your plea agreement.  The first

13   question is:  Do you believe the government has the

14   evidence to prove what's in Paragraph No. 2 of the plea

15   agreement?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And the second is:  Did you, in

18   fact, do what you're charged with in Count 1 of the

19   indictment, which charges that on or about June 1, 2016,

20   here in Kansas, you knowingly transported S.L. - those

21   are the initials - an individual who had not obtained

22   the age of 18 years in interstate commerce, in other

23   words across state lines, with the intent that the

24   individual engage in sexual activity.  Did you, in fact,

25   do that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  Mr. Burdick, if you

3   and Mr. Viquesney are ready, you can sign the petition

4   to enter plea at this time.

5      (Defendant executed a document in open court).

6          MR. BURDICK:  Judge, at this time I'll

7   present the plea petition and the plea agreement to the

8   Court.

9          THE COURT:  All right.  And, Mr. Viquesney,

10   if you'll stand and raise your right hand, we'll

11   acknowledge your signature on the petition.

12                (Defendant sworn).

13          THE COURT:  All right.  And if you'll remain

14   standing.

15          Mr. Burdick, Ms. Flannigan, do you know of

16   any reason why I should not take Mr. Viquesney's plea at

17   this time?

18          MR. BURDICK:  No, Judge.

19          THE COURT:  Ms. Flannigan?

20          MS. FLANNIGAN:  No, Your Honor.

21          THE COURT:  All right.  Mr. Viquesney, would

22   you like me to read aloud to you the indictment or do

23   you waive the reading of the indictment?

24          THE DEFENDANT:  I'm going to waive it.

25          THE COURT:  How do you plead to this

1    one-count indictment?

2             THE DEFENDANT:  Guilty.

3             THE COURT:  All right.  You can be seated.

4    The Court is satisfied and finds that the defendant,

5    Logan Viquesney, is mentally competent at today's

6    hearing and was at the time of the commission of the

7    offense.

8             The Court finds that Mr. Viquesney enters

9    his plea on an informed basis, he's had the advice and

10   representation of experienced and competent counsel in

11   Mr. Burdick.  And through that representation and

12   supplemented by my conversation with Mr. Viquesney this

13   morning, I'm satisfied that he is aware of the charges,

14   the factual and evidentiary basis for the charges.  He's

15   aware of his right to a jury trial and the potential

16   civil rights and sentencing consequences of pleading

17   guilty.

18            I find that the plea is knowingly and

19   voluntarily made.  I find that it is supported by an

20   independent basis in fact containing each of the

21   essential elements of the offense.  So the plea is

22   accepted, Mr. Viquesney is adjudged guilty of Count 1 of

23   the indictment.

24            I'll order a presentence report.  We'll

25   schedule sentencing for July 24 at 1:30 p.m.  I'm

1  specifically accepting the plea agreement at this time.

2  So, Mr. Viquesney, you can be aware now of what your

3  sentence is, it's as you and the government have

4  negotiated.  But we will go through the presentence

5  process and schedule sentencing for July 24th at 1:30.

6         Detention will continue pending sentencing,

7  so I'll remand Mr. Viquesney to the custody of the

8  marshals service.  Mr. Burdick?

9         MR. BURDICK:  Mr. Viquesney had told me once

10 before and I had forgotten today, but the week of the

11 24th his mother is going to be out of town and she did

12 want to be here for sentencing.  Is there any way we

13 could maybe schedule it a week later or a week earlier?

14        THE COURT:  Sure.  Probably later to give

15 the-- would July 31st work?  Wait a minute.  Just a

16 minute.

17        (The Court and courtroom deputy confer).

18        THE COURT:  All right.  So how about

19 July 31st at 1:00 p.m., does that work?

20        MS. FLANNIGAN:  Yes, Your Honor.  I think

21 I'll already be here for the *limine* conference for Mr.

22 Currie.

23        THE COURT:  Okay.

24        MR. BURDICK:  Yes, that will work.

25        THE COURT:  That will work?  Okay.

16-20060-01-JAR   USA v. Logan Viquesney   05.31.17          29

1    July 31st at 1:00 p.m.

2              MR. BURDICK:  Thank you.

3              THE COURT:  All right.  We'll see you back

4    then.  We'll be in recess until 1:30.

5              (10:52 a.m., proceedings recessed).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4      I, Kelli Stewart, a Certified Shorthand Reporter and

5   the regularly appointed, qualified and acting official

6   reporter of the United States District Court for the

7   District of Kansas, do hereby certify that as such

8   official reporter, I was present at and reported in

9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 29 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED April 12, 2018.

15

16

17

18           /s/ Kelli Stewart

19           Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25